Good morning, Your Honors. Good morning. John Wallace. I represent Richard Marullo, and I'll be addressing just simply if the Court has questions on his capacity or standing. All right. Why don't you tell us why there is standing? Mr. Marullo sued in his own name, which is the requirement under Rule 17. No requirement to identify your capacity for purposes of jurisdiction. So rather than take any further time away from Mr. Shimano. Well, aren't there some cases that say if you're suing in a representative capacity that has to be made known? No. The trust capacity and the individual capacity are different, aren't they? Well, the rule requires that you sue in your name, and the capacity is a different issue. It's not a jurisdictional issue. So how would you have standing in terms of because people could sue in their names, but you still have to be connected to the particular entity that had the standing to bring the issue? In this case, the entity that had the shares or the portion of the shares that were sold. So I don't know that it's enough simply to say, well, that's my name, and therefore I can sue in that capacity. There has to be a connection between the name and the actual entity or the entity that possesses the shares that have the standing. What I'm saying is that in the filing, doesn't there have to be a connection? Certainly, we can read the briefs to understand who your client is. The question is, what has to be established in terms of filings to make that connection? There's nothing in the record of the briefing that shows he did not have standing. And factually, he is the trustee. Your argument is really conclusory, I have to tell you. If you want to stand on it, that's fine, but you're not helping us to get to the point of this. Because just to say, using his name has standing, doesn't really answer the question that Judge Boulware raised. But if you're satisfied with that, then you're satisfied. He was founder of the company and he is the trustee. But in the notice of appeal, we're talking about in the notice of appeal, it doesn't contain all of that. Informality of form is no basis to dismiss an appeal. Good morning. It may please the court. David Shimano on behalf of John Charles Maddox, a member of Class 1F under the confirmed plan. I'd like to reserve three minutes for rebuttal. I will briefly address the standing issue for a separate reason, Your Honor, and that is if this court reverses, it's reversing confirmation with the treatment of Class 1F. For instance, if you look at the TMT trailer case... Well, just for those shares that were sold on a pro-rata basis, right? Not for the... Correct. We are just here on the valuation. And if you look at the TMT trailer case, the appellant was the official equity committee. It was not that each member of the class filed its own notice of appeal. If this court were to hold that each member of the class had to file its own individual appeal, it would be chaotic. There could be hundreds, there could be thousands of members of a class. There really should be generalized treatment. But that's not my issue. That resonates more with me, the fact that each member of the class has to be treated the same. So if one member files a notice of appeal, then the treatment has to be fair across the class. That's correct, Your Honor. That's a much better answer to me. That's the correct answer. As a matter of statutory construction, case law, and constitutional requirement, the members of Class 1-F were entitled to receive, under the Charlestown Plan, the economic equivalent of the residual equity value of the reorganized debtors as determined by probative valuation evidence at the trial. The code doesn't specify a particular valuation method. So explain to us why the valuation methodology by the bankruptcy court was deficient in this case. The court did not perform any valuation methodology. If we look at the confirmation record, what was submitted at trial, the only evidence submitted regarding valuation was the disclosure statement, which listed appraisal values of the properties, and the declaration of Mr. McConnell, Charlestown's expert, who said that those valuations were conservative. That was the evidentiary record of valuation at the confirmation trial. And those valuations showed, at minimum, $1.21 per share of equity value. But we're not just talking about the trial, right? Because the decision about what the final valuation is is actually after the trial and several motions and hearings. So wouldn't it be all of the record that was before the bankruptcy court judge when she made that decision for 45 cents? It wouldn't simply be the record for the confirmation trial. If that's correct, Your Honor, but I do want to emphasize that Charlestown had a burden of proof, and they did not meet a burden of proof. And the bankruptcy court legally erred by shifting the burden of proof to Class 1-F. If you look at the findings of fact, the judge said Class 1-F did not submit its own valuation evidence, and that was a failure of evidence on behalf of Class 1-F. If this court holds that a plan proponent can propose a crammed-down plan, present no valuation evidence, and the bankruptcy court can confirm the plan because the dissenting class does not submit its own evidence that rebuts nothing, it will fundamentally change how confirmation trials are conducted. Not shifting the burden of proof. The court was just trying to say, in the absence of any other evidence that could be relied upon, this evidence is good. But remember, put yourself in the shoes of a dissenting class. A plan is proposed, you are prepared to object to it, there's a confirmation trial, evidence is supposed to be presented for you to rebut or contradict or to present competing evidence. They presented evidence. They presented evidence of equity value of more than $1.21 per share. There was nothing to rebut at the confirmation trial. They presented evidence of residual value, the dissenting class. Correct. How does residual value necessarily equal what would be the appropriate price for the share at the time? Because that's not necessarily the same thing, right? Because your expert, Mr. Reese, did a straight calculation based upon that, it's based upon speculative assets. Why is residual value the appropriate measure for value? Two reasons, Your Honor. TMT trailer is very explicit. That's the Supreme Court of the United States addressing this very fact pattern. And it said that you do not look at the value of the debtor as determined by the market or otherwise as it is in bankruptcy. You have to look at it assuming the plan is confirmed and the reorganization value has manifested itself by the confirmation of the plan. So the current stock trading price prior to confirmation is not evidence of reorganization value. And every single case, and we brief it for you. But that's actually not my question. My question was, why is residual value, which is the number you're using, the appropriate value? Because that is by definition the result of the corollary to the absolute priority rule. The corollary of the absolute priority rule says where there is cram down, where you have a dissenting class. No senior class can receive more than 100 cents on the dollar. Any value after the senior class gets 100 cents on the dollar must go to the following junior class. So when you have equity, when you have creditors paid in full, the result of all value in excess of that must go to equity by definition. There is no case that contradicts that as otherwise. And if you look at every single case where bankruptcy courts have valuation trials, that is what the testimony is intended to prove. Was there an issue on the absolute priority rule in this case? There is not, Your Honor. There is not because this is a very unique case where this is not where the creditors were getting more. This is where a new investor was coming in. And therefore, they technically complied with the absolute priority rule. We never disputed that, but that does not go to whether the plan itself is fair and equitable. Right, but those are two different issues. Whether or not there was compliance with the absolute priority rule doesn't drive the issue of whether or not the plan was fair and equitable. I would only emphasize that the corollary of the absolute priority rule, which no senior class can get more than 100 cents on the dollar, drives the interpretation of fair and equitable. What case says that, that the corollary of the absolute priority rule drives the determination of fair and equitable distribution? What case says that? And that residual value necessarily equals what would be the appropriate valuation of the share. Because you actually cite cases that talk about how those values are different. And that's part of the reason why there should have been a separate hearing. So that then you come back later on and in somewhat sort of contradictory way say, well, actually those two values are the same. So how can we take both parts of your argument? If you, I would encourage you to read, we cited in the reply brief, the Lawview article of Kenneth Klee. I ask you for a case. And Your Honor, this is non-controversial. But I'm asking you, is there a case that says the corollary of the, this is your statement, not mine, the corollary of the absolute priority rule drives the determination of whether or not there's fairness in the valuation. That's what you told me. All the cases that cite the corollary. Give me your very best case for that proposition. Well, TMT Trailer deals with this very issue. It deals where the court, the Supreme Court said, you have to value the company on a reorganized value to determine whether there was equity value allocable to the equity. I'd like to talk about the corollary of the absolute priority rule. That's how you couched your argument. Correct. And we cite cases regarding the corollary, both Supreme Court cases and recent bankruptcy court cases. And I will encourage the court to read Professor Klee's article. And the reason Kenneth, Professor Klee's article is very important. It has been cited multiple times by the Supreme Court in the crammed down context. Professor Klee was the primary writer of the bankruptcy code in 1978. And he gives the exact example of why the absolute priority rule is insufficient. Satisfaction is insufficient where the debtor is solvent. And he says, the reason is, is that if you were to satisfy the absolute priority rule, but not pay the equity, the residual equity value, that would mean by definition, somebody else would be getting more than they would otherwise be entitled to under the plan. It's very theoretical. It's, Your Honor, this drives, this drives confirmation trials. When we go to confirmation and the court has to make a finding, a fair and equitable, it has to make a finding evaluation. What is it supposed to do? Courts around this country think it is the residual equity value. So why in the three plans that your client proposed, do they not offer anything close to what was ultimately confirmed by the bankruptcy court? Because one of the things that I'm concerned about is this sort of the dichotomy of you coming to this court to argue about how it's not fair what the value was that your client received for their shares. When, when there was an exclusive exclusivity period, none of the plans came close to offering that value with respect to those shares. That's absolutely not true, Your Honor. And this goes to the heart of the appeal. What, first of all, I represent Mr. Maddox. He is not a planned proponent. He is simply, in this context, a shareholder of a dissenting class. And you cannot confuse, and you cannot confuse the two. Right. Okay. Because this court is writing an opinion that's going to apply to confirmation trials going forward. And it's important the court understand that most shareholders and most creditors are not planned proponents. But in this case, the debtor proposed a plan in which allowed equity to retain their shares in full. And Charlestown proposed a plan that required the sale of shares at 35 cents. The only way to compare those two, to find which is higher and better, is to determine the value of those retained shares under the plan. The position of Mr. Maddox, who had the election to choose these two plans, was the retention of his shares was much more valuable than selling for 35 cents. He turned out, of course, to be correct. Because Charlestown, the shares they purchased for 45 cents in 2011, were sold for $2.59 last year. A gigantic windfall, which was predicted at the time. And the $2.59... Counsel, there were findings made by the lower court in this case. So to the extent that the lower court used a combination of the evidence presented by the Charleston planned proponents and the use of the pink sheet, whatever the bankruptcy court had to reach, what the court thought to be the fair and equitable price, it ultimately resulted in a ruling with findings made. So what standard of review do we use when we look at those findings? You look at a standard, a de novo review of what fair and equitable requires. It's a de novo review of how you value, you make your valuation determination. And once the court makes a correct valuation determination, through the correct methodology, then you review for clear error. We never get to clear error in this case, Your Honor. So if we decide that the valuation methodology in this case was fine, then the determination or the finding that it was worth 45 cents per share is entitled to clear error deference, right? If the court does a proper valuation, then yes, its decision is reviewed under clear error. But we never get to clear error in this case because the court never properly valued the equity value. Counselor, am I correct that your position is that the only proper way to do an evaluation is to first value the property as a going concern? Is that your argument? What TMT Trailer says is... I'm asking you, is that your argument? Yes, the court, yes. So aren't there other cases that sanction different methods of valuation? They're in the crammed down valuation context, where we're trying to determine the share that goes to equity and the shares that go to other parties. The answer is no. They do not cite a single case that suggests there is any other purpose of the confirmation trial other than to determine the reorganization value minus the liabilities and you see what's left over. There is no other way to do it. But wait a minute. Is there any case that says that this is the only method for doing that? Because my review of the cases would indicate that the Supreme Court has been very clear about the method of evaluation depends upon the specifics of the particular case. And therefore, there's no absolute or bright line rule that says that there has to be evaluation here. Isn't that right? That is not correct. So the Supreme Court has said the way you value depends on the facts of the case. Right. But your end, your purpose is always to determine the reorganization value. You may determine it by appraisals. You may determine it by cash flows. Let me go back then. So why isn't a competitive bidding process an appropriate valuation method in the context of this case? Because you partially answered my question, but I think it's not true to say the valuation method doesn't depend on the facts because you're saying it does. But in this case, it depended upon there being a specific method. So why isn't the competitive bidding method that appeared in part to have in this case a sufficient valuation method? And we addressed that in the reply brief. There was no competitive bidding process. This was not an auction of the equity where the court said, OK, the securities are getting paid. The unsecurities are getting paid. We're now going to see who's going to give the most money for the equity. That is not what occurred. There was no competitive bidding. The record is clear about that. What there was was improved plans over time as the market improved, as parties were able to get better financing to finance their plans. The treatment of shareholders improved. That is certainly true. So you're saying that the different proposed plans back and forth between Charlestown and the debtor were not actually competitive bidding. That's what you're saying. Not for the equity. Not for the equity. Secured creditors had different treatments and encouraged plans. The outland minority equity holders obviously had their own interests. That's certainly true. But overall, with respect to who was paying more for the equity, there was no competitive bidding. And again, you could only make that determination if you valued the equity itself, the retention of the shares at confirmation, which you could only do by determining the reorganization value and the net residual value. And the Supreme Court refused to do it. If you look at the Bankruptcy Court's findings, what she actually ruled, she said, I'm looking at the over-the-counter stock price, and the appellees barely even defend that argument anymore. They argue that Class 1e accepted the plan, and that shows what a willing buyer and willing seller would be willing to pay. And that is absolutely legally erroneous. You cannot treat what a consenting class is willing to do as evidence of valuation for a non-consenting class, because we're talking about a forced sale. And I would add about this point, it's not brief, the relevance of Class 1, there is relevance to cram down that they accepted, and that is not fair and equitable. That is the unfair discrimination test. Once the debtors settled, once Charlestown settled with the non-insider shareholders at 35 cents, the unfair discrimination test says you can't cram down at less than 35 cents. That's true under the unfair discrimination test. But under fair and equitable, you have to show fair value by probative valuation evidence, and that was not done at this confirmation hearing. And if you were to hold that a shareholder could have value taken away without expert testimony, without evidence, without evidence of actual economic valuation, you will radically change what bankruptcy lawyers and bankruptcy courts do in the Ninth Circuit. Look at what the bankruptcy courts do in cases across the country. There was a bankruptcy court who actually did this. So I'm not sure that that argument... She erred. Correct. She erred. She erred. And she erred for the reason... You said we would change the way they're doing things. Well, if you... This is the way this bankruptcy court actually performed the valuation. If you look at TMT trailer, Your Honor, I really encourage you to read it. That dealt with this exact fact. We've read the case. I agree. But that was the case. Again, this judge felt incredible pressure to confirm a plan. She thought the Charlestown plan was the better plan, and she may have had good reason to believe it was the better plan. That's not the issue. The issue is whether she could cram down. Okay. So your argument is that they would have had to present some expert or some expert would have had to testify. But isn't the case there's also a lot of discussion in the literature and since LaSalle that talks about how experts don't necessarily have a better idea as to the value in a going concern as this as the market does. So why would we revert back to a method of valuation that appears to be disfavored moving forward? Again, we address this in detail, Your Honor. Market capitalization is evidence. It's valuable evidence. But the cases, the bankruptcy courts that have used it are looking in hindsight. They're looking at a historic transaction and looking how the market reacted to it. At confirmation, you are doing a projection, a forward-looking estimation of what value is. And TMT tells us you do not look at it at the market trading price at that moment, especially under the facts of this case, where the Charlestown plan was proposing to buy shares over the objection of shareholders for 35 cents. Why would somebody pay more than 35 cents in the marketplace when that was happening? And again, we have the fact of the minority shares. So the market capitalization use was not appropriate in this case. That's what the expert testimony said. Mr. Reese testified to that fact. Market capitalization is not appropriate. That was unrebutted. It was unrebutted. And again, the court's findings do not address it at all because the court made its decision to confirm the Charlestown plan and really was not interested in the crammed-down standard at the end of the day. Thank you, counsel. You've exceeded your time. We will give you one minute for rebuttal. Thank you. Good morning, Your Honor. May it please the court. Christopher Prince of Lesnick, Prince and Pappas for the Charlestown proponents. There's counsel for Evoke, the debtor is in the courtroom, but I'll be handling the argument for both. To address the first issue, which you addressed to Mr. Morello, which is the standing, a notice of appeal is jurisdictional. It is not a complaint that can be amended or corrected to deal with facts. And as Your Honors have noted, the capacity in which one is filing is of critical importance. There is a reason why there's such a thing as a trust and that a party is a trustee or is an individual. So filing a notice of appeal as an individual does not preserve the issue for everything. To address the point that Mr. Shimano made on behalf of Mr. Morello rather than his own client, the idea that a committee filing a notice of appeal, which by definition, a committee is a representative of all of the members of the class that it represents, that is not the same as finding that an individual who files a notice of appeal on his own individual behalf somehow preserves the appeal for all appellants. If this case were remanded, it would not reopen the issue as to all insiders, it would reopen it to the persons that have appealed. This court does not have the ability to order relief for persons who are not part of the appeal and are not litigants. But in the bankruptcy context, the complication is that all of the members of the class have to be treated the same. All of the members have to be treated the same in the context of a plan, but your honors would be remanding to provide relief to the appellants. So there would be, I mean this goes back to why the appeals likely equitably moot, your honor, because you're talking about modifying a plan on appeal which alters rights to persons that are not before the appeal. Now I noted that the panel issued, the clerk issued an order denying the motion to dismiss and I did not know whether that was with or without prejudice to argue it here today. I noted that there were no questions for counsel on the mootness issue. I was going to ask you about FRAP rule 3C.  It appears that, you know, when that rule was amended, there was an intent to loosen the requirements in the notice of appeal. If there is an intent to appeal on behalf of a party not named in the appeal, it's deemed well taken. Why can't we use that rule to say that the individual of filing evidence in intent to file on behalf of the trustee? I'm reading the rule, your honor, to make sure that I'm following you. I'm specifically referring to our 2003 opinion, retail flooring dealers of America versus Ballou. Well, what I see is that the rule says the notice of appeal must specify the party taking the appeal. Well, 3C.4 says an appeal must not be dismissed for failure to name a party whose intent to appeal is otherwise clear from the record. So this seems to be that situation here. It says informality of form or title. I don't believe that capacity, in other words, is form or title. Well, you're not disputing the capacity. You're actually not saying that there's affirmative evidence that Mr. Reynolds actually doesn't represent the trust or somehow there's a separate entity, right? No, your honor. Okay. So we're really talking about the formality of having actually included his name as the trustee or the trust, right? That's correct, your honor. Okay. Let me have you address the share valuation. Because this was complicated for me. I don't want to speak for my colleagues to understand where did the $0.35 per share come from? Was that through the product of negotiation? There was some reference to that, and if so, negotiations with who? Yes. So contrary to what counsel for Mr. Maddox has asserted, there was, in fact, a competitive process, and that's actually a factual finding that the court made. Again, frequently Mr. Maddox will refer to things as if there were not a factual finding made by the court. What was that competitive process? How did you arrive at the $0.35 per share value that you proposed? So there are three elements to it that represent a competitive process. The first is that the process for proposing plans was opened up to multiple parties. So as one of the panel members noted, at one point the debtor had exclusive right to propose plans, and at that time the plans basically involved wiping equity holders out entirely. Once exclusivity was terminated, the bankruptcy court, and this is actually the predecessor to Judge Kaufman, Judge Thompson who was sitting as the bankruptcy court at the time, permitted the creditors committee to submit a competing plan, the equity committee to submit a competing plan, Charlestown to submit a competing plan, and then later allowed Legendary Investors, which was a secured creditor, to submit competing plans. So the equity committee and the creditors committee declined to submit any plans of their own and relied on the other parties to submit plans. So the first element that it's a competitive process are the ability for five and potentially more, given that the court was open to opening the process to other parties, five or more parties to submit plans. That's the first element of competition. The second element is that non-insider shareholders, in other words, shareholders not named Morello and Maddox for the most part, were represented by an official equity committee. That equity committee represented minority shareholders who had just a bare economic interest in the shares as opposed to an interest in being the CEO and board members and control the company. That equity committee and the testimony of the chair of the committee, Mr. Taylor, is in the record. Who's appointed by the trustee. Appointed by the United States trustee's office, which is an arm of the Department of Justice. Right. Has a fiduciary duty to represent the interests of shareholders. And Mr. Taylor testified that he negotiated with each of the plan proponents to try and get the best deal for shareholders. And his specific testimony was that he felt that this was the best deal possible under the circumstances of getting new management and new investment. So during that negotiation process, was it an attempt to basically get to a market-based evaluation of what the shares were worth? That's where 35 cents came from? It's an attempt to get the best deal, which is essentially what is what a market is. Now, I'd like to address. Well, I guess my question with the methodology in this case is that this is an unusual situation where subsequent to reorganization, all creditors will be paid off and there's a lot of value left over. So why shouldn't, under the factual circumstances of this case, the process be subject to the classic battle of the experts versus something like the pink sheet trading price, which would artificially, I guess, deflate the real value in light of the fact that you're in bankruptcy, there's a proposed plan for 35 cents, all of that would seem to depress the natural fair market value. So it seems to me like the type of case where even though generally there's a preference for market-based valuations, that this might be beneficial to have the experts from competing sides come in and talk about whether it should be closer to residual equity value. The first point would be that at no point did the court refuse to consider some sort of enterprise valuation of the type that Mr. Maddox is proposing. They declined to introduce that and they asked for a continuance of the trial on reconsideration to have a separate valuation hearing. But at no point did the court say, I'm refusing to consider any evidence of what Your Honor's talking about. But the critical distinction, I think, Your Honor, between the issue that you're talking about, which is the sort of residual value, is that it was uncontested that without the infusion of outside money, this company would fail and there would be no value whatsoever for anyone. This is Mr. Reese's own analysis. He did the liquidation analysis for the company and the liquidation analysis shows that there's no value. By definition, the only way to get value was to go to the marketplace and solicit outside investment to unlock that value. So in other words, what you're saying is that the residual value wouldn't be a fair determination of what would be the appropriate share value because the liquidation value itself was zero. That's correct, Your Honor. And to put this in a more specific context, counsel for Mr. Maddox has doubled down on his use of TMT Trailer, which is the Supreme Court decision decided under the Act, the old Bankruptcy Act. The Bankruptcy Court recognized that being decided under the Act, it was totally inapplicable. But Mr. Maddox is continuing to rely on it. And in fact, when the panel asked, do you have any cases, this is what he referred to. There are two critical reasons why TMT Trailer just has no relevance to what we're talking about here. The first is, is that you're talking about an allocation of value as between creditors and shareholders. They are within the bankruptcy process. There's no discussion in TMT Trailer or the cases that relate to TMT Trailer about how outside investment should be valued. The second is the context of the Act. And this is why it's in this context. Under the old Bankruptcy Act, there was no ability for creditors to agree to take anything less than 100 cents. They did not have the ability as a class to say, I accept this treatment. The court had the independent requirement to determine that they got exactly 100 cents on the dollar for their claim. Secondly, under the Act, secured creditors could not be paid in a stream of payments over time as they are today. They had to be paid on the effective date of the plan, either in cash or in some form of security. So, as a practical effect, under the Act, what would happen is, and this is reflected in TMT Trailer, secured creditors, bondholders would get a package of securities, income bonds or preferred shares. And shareholders would get some other form of security. And by definition, because there was no ability to agree to a, there was no ability for the bondholders to agree to a specific treatment, the court had to do a valuation. And there was no ability to test it by the market. The plan had to hit a sweet spot. Creditors can't get more than 100 cents on the dollar because they're just creditors. They get 100 cents. And they can't get less than 100 cents on the dollar because they can't agree to anything less. And so, the court, under the old Act, had to hit that exact sweet spot where it could find, as a matter of fact, that the creditor was getting exactly 100 cents and that shareholders were getting the residual value. So what you're saying is that the old Act didn't have the mechanism that you have now for there to be a separate basis for the court to be able to make a factual finding as to the treatment. There was no ability to do a market test to conclude what the securities were worth. The only context in which a market test comes out is the new value, quote unquote, exception to the absolute priority rule. This is when the court says, someone is saying outside money is worth a specific amount and I need to figure out if that's true or not. And what the Supreme Court has told all courts in no uncertain terms is that experts are not the way that we want to deal with that valuation issue. When you have outside money, it needs to be put to the test of the market. There is no other better test for valuing what that outsider is getting. And remember what the relief Mr. Maddox and Mr. Morello are seeking. They said that they're trying to claw back money from these outside investors based on the idea that they got too good of a deal. They're not asking for a modification of the plan treatment. They admit that they can't get any more money from the debtor, that that would be moot. They're actually saying somehow they can go out to these investors who agreed to a specific deal and they can challenge it as being not a good deal and that despite their inability to present any evidence at the time that it wasn't a good deal, that we somehow failed to meet a burden of proof that the only possible relevant evidence is the testimony of an expert. That cannot be the law, Your Honor. Counsel, what's your response to opposing counsel's position that in a crammed down circumstance, the bankruptcy court must first determine the reorganization value? Is your response that that was based on the TMT trailer analysis and does not apply? I think that's right. If you look at the, if you listen to Mr. Maddox's counsel's argument and if you read the briefs, they're relying very, very heavily on these old cases where as I've discussed, there was no possibility of determining value except by experts. It was almost impossible. They cannot cite a single case even under the act which said you were allowed to challenge what a third party investor is paying on the idea that it's not fair and equitable. And I'd like to go back to the whole issue of what is the bankruptcy court's discretion to do here? There's not a statutory definition of fair and equitable. There's no question whatsoever that we met the statutory definition of fair and equitable. So what Mr. Maddox and Mr. Morello need to argue is that as a matter of law, under a classic totality of the circumstances, which is the court is asking itself, do I need to do anything further than what the literal language of the statute requires? That as a matter of law, the court had no discretion whatsoever to determine what that meant and what quantum of evidence could be used to prove that. But why wouldn't we, in this specific case, think about reminding it in the context of a bankruptcy judge who said herself that the 45 cents seemed, quote unquote, arbitrary when she made a determination? I mean, that seems to me to at least suggest the possibility that she was unsure of what the basis was for the 45 cents or that there wasn't sufficient record to be able to support the 45 cents. Because that's a pretty, I think, strong statement for a judge to make about her own decision. Yes, Your Honor. And had the record ended immediately after that statement, I think I would be inclined to agree with you. There are two elements that I would point out. One is that that statement was made after a tentative ruling in which there was a colloquy with the parties about the appropriateness of using the 45 cents. Subsequent to that, there were further proceedings, including a motion for reconsideration. And the bankruptcy court made it explicit that that was not, that I think she characterized it as a minor factor. And she said that there was sufficient evidence to confirm at 35 cents without regard to the 45 cents. So in other words, you're saying that the clarification was that the judicial notice of the market price at that point in time was one and not even necessarily the primary factor, as Maddox has suggested, in determining what the 45 cents, determining the 45 cent valuation. I would go even further, Your Honor. The bankruptcy court's use of the 45 cents, this was not submitted by the Charlestown proponents. The bankruptcy court used it to improve the treatment for Mr. Morello and Mr. Maddox. The bankruptcy court found and stated at the hearing on the motion for reconsideration that she would have confirmed at 35 cents but for the 45 cent figure. So this is, if the Charlestown proponents could have appealed that finding, I mean, we could not because it was a voluntary modification of the plan based on the court's decision. But that would be an error for the Charlestown proponents. Mr. Morello and Mr. Maddox cannot say that when the court itself said it would have confirmed at 35 cents and it used the pink sheets to raise that to 45 cents and give them more money that that's a reversible error. Because there was differential treatment because the other equitables got 35 cents. That's correct. The equity committee consented to the treatment of the outsider equity class at 35 cents. Counsel, just briefly, do you maintain your equitable mootness argument in light of our recent decision in NRA TransWest Resort property? I do, Your Honor, and it's the, as the panel's aware, the opinion was modified on rehearing. And I think the modifications on rehearing clarifies expressly why TransWest still stands for the proposition that this appeal is moot. And if you'll bear with me, I have the distinction between the modified and the original opinions written out. And the original opinion said that the form of relief thought, which would include distribution of money from the investor, SWVP, would not, that the court could order SWVP to pay money. But as modified on, after a rehearing, the court clarified, no, we're not saying that it's payment from the reorganized debtors to the lenders would not render this moot. So they eliminated the concept that you could go out after the third-party investor and order them to pay money. And this was further clarified in that a portion of footnote 12 from the original opinion, which discussed the idea that SVP could be ordered to pay money, that was deleted. And the court removed that. Under the TransWest, it remains the case today that a court may order that a plan be modified on appeal, but I'm not aware of any decision where an outside investor is compelled to pay money, additional money as compensation. That that equitable mootness is that there's no relief that can be granted. That's a very high standard. It can be a very high standard. I think in this case, though, it's met. They've not shown, the appellants have to establish at some level, they have to say to this court or the court has to identify some kind of relief that it could get. And I mean, hypothetically, if the court were to remand, there has to be some direction to the bankruptcy court. What is the bankruptcy court going to do? The appellants have disclaimed that they can get the money from the debtors. So the plan can't be modified, and there could be no further distribution of money from the debtor. The appellants have said that they will go after Charlestown. And I put that in quotes because all they do is they just define Charlestown to mean Charlestown and a whole bunch of other people, which we can't even describe. They use the term voluntary collaborators, which is a term I'm not familiar with and I've never seen in any case. I don't know what that means. Is Bank of America that settled with the plan proponents and agreed to support the plan and then received a distribution? Are they voluntary collaborators? Can we claw them back into the case in order for them to pay money? I think that's up to the bankruptcy court to determine. If there is any equitable remedy that can be fashioned by the bankruptcy court, even though the plan has been substantially consummated, then equitable mootness does not present. I don't agree, Your Honor, that a free form remand to allow the bankruptcy court to decide. That's what we said in NRA Trans West Resort Properties, whether the bankruptcy court could fashion equitable relief without completely undoing the plan. That's very broad. It is broad, but it is specifically narrowed to the point of who does the court have authority to order to do things? That would be up to the bankruptcy court to determine. Isn't the bankruptcy court in the best position to be able to identify what equitable relief would actually exist? I think part of the issue is you're asking us to go back through, I think, all of the proceedings that appeared before the bankruptcy court to then come up with a specific form of potential relief and consider that or not. But why wouldn't we, in the first instance, simply remand it to the bankruptcy court? Because the bankruptcy court could make the determination. In fact, there was no equitable relief based upon the proceedings that had occurred or that there was. But why would we at this level make that determination? Because Mr. Maddox has identified the parties against whom he is seeking the relief, and the court knows that it can't order them as to those parties. Well, I don't know about that. Anyway, you've exceeded your time. Thank you, Your Honor. A rebuttal? A lot to say in a minute, Your Honor. Regarding this equitable newness, I encourage the court to look at Arnold and Baker Farms, which we cite. The court said that a third party that received real property under the plan could be required to give it back because the cram-down treatment of another secure creditor was inappropriate. Bankruptcy court certainly has jurisdiction to empower to order third parties to return property. Your Honors, I just need to emphasize a cram-down is not a popularity contest. The fact that everybody else liked the Charlestown plan, the bankruptcy court liked the Charlestown plan, it doesn't mean anything for purposes of cram-down. You must meet an objective economic valuation test. And if you hold that... Okay, I know you're going to go back and say we're going to make a big mistake. We get it. That's actually not helpful, so I don't think you should repeat that. What I would like for you to do is address the argument that was raised with respect to the TMT trailer about how that process or the decision occurred in the context of a different act and different circumstances that relate to what the bankruptcy court judge had to decide. Yes, I will say this. Under the act, it was very difficult for shareholders to participate in plans because you could not settle with a class and bind dissenters. Consent, right? Consent did not solve the problem for a class. And so you had the problem where 99% of the bondholders would support a consensual restructuring where equity would stay in the money, but one shareholder would dissent and you were bound by the absolute priority rule. And so under TMT trailer, in that scenario where you could not bind the minority shareholder, the Supreme Court did look for ways to try and create avenues for equity to participate in plans. And part of the 78 code, it cured that obstacle because now consent, you can consent by binding dissenters of the class. And so therefore, that's why class 1E, who agreed to the plan, were not crammed down. They could agree equity could keep even though hypothetically someone junior would support the plan. But that doesn't change what TMT trailer said you have to do where there is a valuation dispute regarding whether equity is in the money or not at all. And TMT trailer determines, it's the holding of the Supreme Court, which has never been challenged. The reason I keep on coming back to it is because this issue never comes up. This is settled law, Your Honors. Bankruptcy lawyers don't argue this. This case was so sui generis. And it may never be repeated, but that doesn't change the fact that legal error. Does it matter that it was under the old act? It does not matter. We cite the case law to the court, Doosnip and the Bonner-Mall decision. There's continuity under the act with respect to fair and equitable and bankruptcy terms of art under the act, under the code, unless they're radically changed. That's Supreme Court law under the code. You look back at the act to govern terms like fair and equitable. Why wouldn't the decision of outside investors to offer money at a particular price be representative of the earning capacity or the going concern valuation? Because certainly you can't. I mean, the market includes some inclusion of consideration of future earning capacity, doesn't it? We address this in great detail of the fact that cram down is a forced sale. If you market, you're not answering my question. I am because the offer there's a you're not answering. Oh, I'm sorry. I'm sorry. There's an offer. There's an offer. There's an offer, but there's no acceptance. And to have a market price, you have to have a willing buyer and a willing seller. The offer is evidence of nothing until there's acceptance. It's a forced sale. The judge is cramming it down. That's the definition. And cram down means the judge needs separate valuation evidence to justify that forced sale. And in this case, remember, there were 88 million shares outstanding. They offered to buy them out at 35 cents. Only 84, only 4 million volunteered to do that. 84 million shareholders, by their own action evidence, they thought the shares were worth more. That's the best evidence of market value. The fact that Class 1F rejected the offer is the best evidence that the fair value was greater than what was offered. And it was then up to the judge to look at the evidence. And it had to be done through extra evidence. It had to be done through valuations. It had to be done through investment banker opinions. It had to be done through appraisals. It had to be done by something. And we, Class 1F, relied upon their evidence, Mr. McGonigal, who said their valuations, which evidenced $1.21, were conservative. And we said, OK, that's your evidence. You can't win. And the judge, post-confirmation, in her need to confirm a plan, and she may have had good reason to want to confirm the plan, she went out of her way to find something in the record. But that something in the record, Your Honor, at least the stock price was economic evidence. It may have been legally erroneous to use it, but at least it was economic evidence. The rest of their facts that the judge relied upon have no relevance. And if this court were to hold that it's OK, why would a bankruptcy judge ever have a valuation hearing ever again? If they have the discretion not to hear expert testimony, not to take appraisal testimony, why would they ever do that? This is their discretion. Thank you, counsel. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: Boulware, Rawlinson, Nguyen